NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case No. 03-51524 |
| | : | Jointly Administered |
| CONGOLEUM CORPORATION, et al., | : | Chapter 11 |
| | : | |
| Debtors and Debtors-in-Possession | : | |
| | : | |
| CONGOLEUM CORPORATION, Debtor-in Possession, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Adversary No. 05-6245 |
| | : | |
| ARTHUR J. PERGAMENT, as the Collateral Trustee of the Collateral Trust, et al., | : | |
| | : | |
| Defendants | : | Hearing Date: July 9, 2007 |
| | : | Document Number: 122 |

**MEMORANDUM OPINION**

**DEBTOR'S MOTION FOR SUMMARY JUDGMENT ON
COUNTS V AND VI OF THE SECOND AMENDED COMPLAINT**

This opinion resolves the Debtors' Motion for summary judgment on Counts V and VI of the Second Amended Complaint. The Court took oral argument on this matter on July 9, 2007, and reserved decision.

The standards for summary judgment are well established. The Supreme Court has stated that "summary judgment is appropriate only when there is no genuine issue of material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c). The party moving for summary judgment has the burden of establishing the nonexistence of any "genuine issues of material fact." Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Third Circuit has stated that whenever there is even the "slightest doubt regarding the facts of a case, summary judgment should not be granted." Tomalewski v. State Farm Life Ins, Co., 494 F.2d 882, 884 (3d Cir. 1984).

This matter is ripe for summary judgment. In Defendants[1] responsive statement of material facts, they attempt, but fail, to raise disputed factual issues that would prevent summary judgment. Defendants broadly state that there are facts in the Plaintiff's Statement of Material Facts that "are either (I) not supported by proper summary judgment evidence, (ii) contradicted by the summary judgment evidence of Defendants, or (iii) contain counsel's characterization of the terms, requirements or effect of documents, as to which Defendants object to the characterizations of counsel as undisputed facts and submit that the documents speak for themselves". *Certain Defendants Statement of Material Facts* at 2-3. There is no specific support for that statement any where in the Defendants's brief or certification. The Third Circuit has held that the party against

---

[1] As used here the term refers to Arthur J. Pergament, as Collateral Trustee, and the asbestos claimants listed on Exhibits 3, 5, 10, 12, 13, 19, 32, 39, 41, 51, 61, 69, 76, 77, 81, 83, 86, 88 and 90 of the Second Amended Complaint.

whom summary judgment is sought may not rest on mere allegations or denials in its pleading, but must set forth specific facts showing a genuine issue for trial. Sound Ship Building Co. v. Bethlehem Steel Co., 533 F.2d 96 (3d Cir. 1976). That was not done here. Additionally, some of the facts that the Defendants claim as contested, such as whether the fully secured asbestos creditors were trial-listed in early 2003, are not essential to this Court's determination. As a result, those facts, even if genuinely disputed, would not preclude summary judgment.[2] *See*, Anderson v. Liberty Lobby, 477 U.S. 242, 248-49 (1986).

Count VI of the Second Amended Complaint seeks to avoid the purported liens and security interests granted to the Collateral Trustee to secure the claims of all of the Secured Asbestos Creditors pursuant to 11 U.S.C. § 544. The Complaint alleges that any purported liens held by the Secured Asbestos Creditors and the Collateral Trustee were unperfected on the petition date. As a result, the Debtor in Possession ("DIP"), as a hypothetical lien creditor under § 544, has a superior interest. *Second Amended Complaint* ¶ 139.

As stated by the Defendants: "Congoleum's entire Motion for Summary Judgment boils down to only one discrete legal issue for the Court to decide: Does the UCC apply to the specific security interest granted under the Security Agreement?" *Certain Defendants' brief in support of response to Plaintiff's motion for summary judgment* at 8. The Court agrees; and the answer to that question is no.

The Debtors have previously maintained to this Court that the security interests they granted are valid and thus must be accounted for in their plan of reorganization. Defendants contend that

---

[2] The Defendants even acknowledge that the "issues presented by the Debtor's Motion for Summary judgment are chiefly legal ones." *Certain Defendants' Brief* at 4.

the Debtors should not be entitled to take inconsistent positions in different legal proceedings[3]. While the Court is profoundly aware of the Debtors' vacillations, it does not think the current argument should be prohibited based on the doctrine of judicial estoppel. Judicial estoppel is an equitable doctrine invoked by a court in its discretion to preserve the integrity of the judicial system by preventing parties from playing fast and loose with the courts by assuming inconsistent positions. McNemar v. The Disney Store, 91 F.3d 610, 617 (3d Cir. 1996)  In this Circuit, a litigant seeking to judicially estop his opponent from asserting a contrary position must show that: (1) his opponent had asserted an inconsistent position under oath in a prior judicial proceeding; (2) the prior statement was accepted by a judicial tribunal; (3) he was a litigant to the first judicial proceeding; and (4) he would be prejudiced unless the opponent is estopped. McNemar v. The Disney Store, 91 F.3d 610, 616 (3d Cir. 1996); *see also*, Ryan Operations GP v. Santiam-Midwest Lumber Co., 81 F.3d 355 (3d Cir. 1996). At least one of those elements is missing here: this Court has never ruled that the security interests are valid. As a result, application of the doctrine would be inappropriate here. Additionally, judicial estoppel is an equitable doctrine that is employed at the court's discretion and exercise of that discretion is not warranted in this instance because the Court has permitted the Official Committee of Bondholders and the Future Claims Representative to intervene in this proceeding. The Bondholders Committee and the FCR should not be disadvantaged because of the Debtors' vacillations.

In this summary judgment motion, Plaintiff maintains that the purported security interest granted to the Collateral Trustee was ineffective because it was outside the scope of Article 9 of the

---

[3] Defendants do not provide a legal theory for why the Court should not allow these inconsistent positions, but the Court assumes it is on a judicial estoppel theory.

4

Uniform Commercial Code ("UCC"). In conjunction with the Claimant Agreement, Plaintiff and the Collateral Trustee entered into a security agreement that was later amended on June 11, 2003 ("Superceding Security Agreement"). The Superceding Security Agreement purported to grant the Collateral Trustee a security interest in "[a]ll of Congoleum's claims, causes of action and rights, whether now existing or hereafter arising, liquidated or unliquidated, disputed or undisputed, fixed or contingent, to receive payment from its insurers or to have monies expended by its insurers for its benefit to satisfy asbestos-related bodily injury claims against it ...." *Superceding Security Agreement* ¶ II.A(1) (Brennan Decl. Ex. 9). The relevant section of the UCC provides that Article 9 does not apply to:

> a transfer of an interest in or an assignment of a claim under a policy of insurance, other than an assignment by or to a health-care provider of a health-care-insurance receivable and any subsequent assignment of the right to payment, but 9-315 and 9-322 apply with respect to proceeds and priorities in proceeds.

UCC § 9-109(d)(8) (formerly § 9-104(g)); Del. Code Ann. tit. 6, § 9-109(d)(8) (same).

The Defendants' first argument is that the transaction was governed by the UCC because the parties agreed that it would be. While agreement of the parties is certainly a cornerstone of the UCC, the analysis is not as simple as Defendants suggest. The parties to a transaction that is excluded from the UCC may agree to have the UCC govern their transaction, but they may not bind third-parties to that agreement. *See, e.g.,* Hong Kong and Shanghai Banking Corp., Ltd. v. HFH USA Corp., 805 F. Supp. 133, 140 (W.D.N.Y. 1992) (parties' choice of law "will not be regarded where it would operate to the detriment of strangers to the agreement, such as creditors or lienholders.") Even one of the cases cited in the Defendants' brief recognizes that distinction. In Intamin, Inc. v. Figley-Wright Contractors, Inc., 595 F. Supp. 1350, 1351-52 (N.D. Ill. 1984), the court recognized what it called the obvious "principle that a contractual choice of law by two parties

5

cannot automatically bind third parties such as creditors." Here, by virtue of § 544, the DIP stands in the position of a lien creditor; Thus the DIP's rights may not be varied because of an agreement to which it was not a party. The DIP is a distinct legal entity from pre-petition Congoleum, so it was not a party to the Superceding Security Agreement or Collateral Trust Agreement that allegedly incorporate the filing and perfection requirements of the UCC. *See*, In re Gordon Sel-Way, Inc., 270 F.3d 280, 290 (6th Cir. 2001)("The debtor-in-possession is considered to be a separate legal entity from the debtor himself.") In re West Electronics, Inc., 852 F.2d 79 (3d Cir. 1988)

The Defendants' second argument is that the exclusionary language of § 109(d) was meant to apply only to transactions involving **direct** security interests in the actual insurance policy itself. They argue that the transaction at issue here is distinguishable because the intended collateral was not the policies themselves but a "chose in action" against the insurance companies and the proceeds of that chose. Defendants' attempted distinction is unavailing.

Preliminarily, the Court finds that argument is not supported by the language of the UCC. Section 109(d)(8) excludes from Article 9 "a transfer of an interest in or an assignment of a claim under a policy of insurance ...." An assignment of a claim under an insurance policy goes beyond a direct interest in the policy itself yet it is excluded from the scope of Article 9. Arguably, an assignment of a claim under an insurance policy is precisely what the Collateral Trustee on behalf of the Secured Asbestos Creditors was granted. As previously noted, the Superceding Security Agreement purported to grant the Collateral Trustee a security interest in "[a]ll of Congoleum's claims ... to receive payment from its insurers or to have monies expended by its insurers for its benefit to satisfy asbestos-related bodily injury claims against it ...." *Superceding Security Agreement* ¶ II.A(1) (Brennan Decl. Ex. 9).

Defendants cite to several cases that they claim stand for the proposition that it is only direct security interests in an insurance policy that are excluded from the scope and coverage of Article 9. *See, e.g.,* PPG Indus., Inc. v. Hartford Fire Ins. Co., 531 F.2d 58 (2d Cir. 1976)("it should be apparent that this exclusion applies only to situations where the parties to a security agreement attempt to create a direct security interest in an insurance policy by making the policy itself the immediate collateral securing the transaction. For example, § 9-104(g) would be triggered in cases where a debtor uses his life insurance policy as a means for securing a debt owed to the insurer.") The Defendants' reliance on PPG and similar cases does not advance their position because in those cases the secured party had an interest in original collateral that was separate and distinct from the insurance policy. For example, in PPG the secured creditor had a security interest in all of the debtor's inventory and equipment. Here, the Defendants can point to no collateral that is separate and distinct from the insurance policies. It is mere semantics to argue that what the Debtors granted a security interest in was a chose in action. The chose in action, to the extent one exists, is the right to collect on an insurance policy. There is no way to view this transaction that results in there being any collateral granted to the Collateral Trustee that is divorced from the insurance policies. Even if viewed as proceeds, to have proceeds of collateral not excluded by § 109(d)(8), the original collateral must be covered by Article 9. No matter how it is sliced, the original collateral here was insurance policies.

Much is made of the one case that held the opposite. In In re Bell Fuel Corp., the bankruptcy court ruled, correctly in this Court's estimation, that a cash payment pursuant to a business interruption policy was proceeds of a claim under a policy of insurance, and therefore outside the scope of Article 9 and not subject to the bank's security agreement. 99 B.R. 602 (E.D. Pa. 1989),

Case 05-06245-KCF    Doc 147    Filed 07/27/07    Entered 07/27/07 16:11:19    Desc Main
Document      Page 8 of 13


*aff'd w/o opinion*, 891 F.2d 281 (3d Cir. 1989). The District Court reversed the Bankruptcy Court and found that a debtor could create an enforceable Article 9 security interest in proceeds from an insurance coverage claim simply by granting a blanket security interest that included general intangibles. The Bell Fuel decision has understandably garnered considerable criticism. *See, e.g.,* In re Investment and Tax Services, Inc., 148 B.R. 571, 574 (Bankr. D. Minn. 1992) ("The Bell Fuel court's reasoning is flawed, it has not been followed, and its has been criticized by courts and commentators alike."); Steven O. Weise, *U.C.C. Article 9: Personal Property Secured Transactions*, 51 Bus. Law. 1459 (1996)(calling the Bell Fuel case "questionable"); Clark, The Law of Secured Transactions ¶ S.1.08[7][b] (Supp. 1991) ("*In re Bell Fuel Corp.* was a case where the court completely missed the boat."). This Court joins with those courts and commentators that think the case was incorrectly decided. In this Court's opinion, the Bell Fuel decision reads the term "general intangible" so broadly that it swallows the exception created by § 109(d)(8). A catchall term such as "general intangibles" should not be used to override a specific exclusion such as that contained in § 109(d)(8). *See*, In re Kroehler Cabinet Co., Inc., 129 B.R. 191 (Bankr. W.D. Mo. 1991), *rev'd on other grounds*, 1992 WL 674733 (W.D. Mo. 1992)(the definition of general intangibles "does not apply ... to types of intangibles specifically excluded from the coverage of the Article ....")(quoting the Official Comment to former § 9-106).

The fact that the Bell Fuel decision was affirmed without opinion by the Third Circuit does little to bolster its faulty reasoning. As one bankruptcy court in this Circuit noted when faced with a similar issue:

> Affirmance of *Bell Fuel* by the Third Circuit does not determine the answer to the question now before us ... Because the decision by the Third Circuit was not published, we have no way of knowing what issues were appealed or what principles were relied upon by the Third Circuit in deciding the appeal.

In re Remcor, Inc., 186 B.R. 629 (Bankr. W.D. Pa. 1995)(the court in that case was also "convinced that [*Bell Fuel*] is incorrect."). As an unpublished decision Bell Fuel is clearly not binding on this Court by virtue of the Third Circuits own internal operating procedures, but beyond that the Court does not find the case least bit persuasive on this issue. *Internal Operating Procedures for the United States Court of Appeals for the Third Circuit* ch. 5.1 - 5.3. Overall, none of the case law cited by the Defendants or uncovered by this Court convinces it that the security interest at issue here falls within the scope of Article 9 of the UCC.

The Defendants' final argument is that even if the Court finds that the security interest is outside the scope of Article 9 of the UCC, the Collateral Trustee still obtained a valid and perfected interest in the asbestos insurance collateral under the common law. Specifically, the Defendants ask this Court to find that a common law pledge was created. As defined by the Restatement: "A pledge is a security interest in a chattel or in an intangible represented by an indispensable instrument, the interest being created by a bailment for the purpose of securing the payment of a debt or the performance of some other duty." *Restatement (First) of Security* § 1 (1941). The key element of a pledge is that the pledgee or a third party bailee is placed in possession of the chattel. Id.; Pierce v. National Bank of Commerce in St. Louis, 268 F. 487, 492 (8th Cir. 1920)( "a deposit of the thing pledged is an indispensable attribute of a valid pledge").

There is scant recent law on the subject because subsequent to the widespread adoption of the Uniform Commercial Code, common law pledges have fallen out of favor as a security device. The Defendants do not assert which state's common law - Delaware or New Jersey - it believes

9

would control this determination. In fact, no where in the brief are the legal requirements for a pledge in New Jersey mentioned. If the Court were to assume for purposes of this motion that the law in both states is similar, then the defining characteristic of a pledge - a bailment of the chattel - is missing here. *See, e.g.,* In re Copeland, 391 F. Supp. 134, 147-48 (D. Del. 1975).

The definition of a bailment is consistent under New Jersey and Delaware law. In Delaware, "[a] bailment arises when one party delivers property to another for some purpose after which the property will be returned to the original party. A bailment occurs when one party retains legal title to a chattel but control and possession of the property is transferred to the bailee." Golt by Golt v. Sports Complex, Inc., 644 A.2d 989, 992 (Del. Super. 1994)(internal citations omitted). In New Jersey a bailment has been defined by our courts as "where an article of personal property is put into the hands of one for a special purpose, and is to be returned by the bailee to the bailor or delivered to some third person when the object of the trust is accomplished." Garfield v. Furniture Fair-Hanover, 113 N.J. Super. 509, 511-12 (L. Div. 1971)(internal citations omitted).

Although the Defendants' brief does not directly address bailment, it states that "the pledge was perfected both by constructive delivery of the insurance policy to the Collateral Trustee and by notifying the affected insurance carriers of the transfer of interest in the insurance policies." *Defendants' Brief* at 28. Neither of those scenarios satisfies the traditional definition of a bailment. The only fact identified as evidence of a "constructive delivery" of the insurance policies to the Collateral Trustee is the execution of the Security Agreement. The Defendants had initially cited the execution of the Security Agreement as evidence of the Debtors' intent to enter into a pledge and secure payment of an indebtedness to the Asbestos Claimants. It is questionable whether the Security Agreement fulfills the first role assigned to it, and clear that it does not fulfill the second.

Execution of a standard Article 9 security agreement is not a bailment. Although possession is a form of perfection under Article 9, in the typical secured transaction the collateral is retained and not turned over to the secured creditor, which makes it markedly different from a bailment. Had the execution of the Security Agreement or the Superceding Security Agreement been a bailment of the insurance policies, then the Collateral Trustee would have exercised exclusive control over the insurance policies and there is absolutely no evidence of that. The Collateral Trustee did not direct the state court coverage action or take any other action that would suggest that he thought he controlled those policies to the exclusion of the Debtors. Certainly no insurance proceeds were ever delivered to or "put in the hands of" the Collateral Trustee.

The alternative theory - that notification to the insurance carriers can serve as a bailment - is even less persuasive. The Defendants claim that the insurance carriers were notified of the pledge of the insurance policies to the Collateral Trustee because on April 18, 2003, Congoleum sent written notice of the Claimant Agreement and security agreements to its insurers. It strains credulity to think that the insurers, upon receiving notice that the Debtors had entered into those agreements, thought that a bailment had been created. The argument is, in fact, defeated by the very Delaware case on which the Defendants rely. In Copeland, the court held that:

> 'Where a chattel is in the possession of a third person a pledge may be created by assent of the pledgor and notification by either pledgor or pledgee, to the third person, that the chattel has been pledged to the pledgee.' Restatement of Security § 8 (1941). 'If the goods at the time the pledge transaction is agreed upon are in the possession of a third person as bailee, the requirement of delivery is satisfied by notification to the bailee to hold the goods in behalf of the creditor.' Brown on Personal Property § 128 (2d ed. 1955) and supporting citations.

391 F. Supp. at 149. The Defendants cannot take advantage of this common law rule because the third parties they claim had notice, the insurance companies, were not the bailees. By their own

argument, the bailee was the Collateral Trustee because that is the party they argue was given constructive possession of the insurance policies. The circuitousness of this argument demonstrates its weakness. The Court cannot find that a common law pledge was created here.

Finally, the Defendants public policy arguments are unpersuasive. Even if they were persuasive, the Court cannot ignore the application of § 544 in an effort to obtain what Defendants perceive as an equitable result. *See*, In re Combustion Engineering, Inc., 391 F.3d 190, 236 (3d Cir. 2004)("[t]he general grant of equitable power contained in § 105(a) cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself.")

In conclusion, the Court finds that the attempted grant of a security interest was ineffective because the transaction was outside the scope of Article 9 of the UCC and cannot be considered a common law pledge. Therefore, summary judgment will be granted in favor of the Plaintiff on Count VI of the Second Amended Complaint.

The Plaintiff also seeks summary judgment on Count V of the Second Amended Complaint. In that count the Plaintiffs allege that "[p]ursuant to Bankruptcy Code § 502(d), any claims of the Secured Asbestos Creditors against the Debtors must be disallowed to the extent the Interests are avoidable under Bankruptcy Code § 544(a)(1), UCC § 9-109(d)(8), and other applicable law. *Second Amended Complaint* ¶ 132. The Court is unclear on the relevance this Code section has to this proceeding. Apparently, the Defendants were similarly confused. *Defendants Brief* at 29-31. In the conclusion section of the Plaintiff's reply brief Plaintiff clarified that virtue of Count V it only seeks a disallowance of any secured interest. Since the Court has already granted summary judgment on Count VI disallowing the security interests, the Court will grant summary judgment on Count V limited to a finding that there is no valid security interest.

## Conclusion

Summary judgment is granted in favor of the Plaintiff on Counts VI and V (limited to the security interest). Plaintiff shall submit a form of order in accordance with this opinion.

>                             */s/ Kathryn C. Ferguson*
>                             KATHRYN C. FERGUSON
>                             US Bankruptcy Judge

Dated: July 27, 2007